**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**February 18, 2014**

# In the Court of Appeals of Georgia

A13A2452. PLEMMONS v. THE STATE.                    DO-091

DOYLE, Presiding Judge.

Glenn Plemmons was convicted of driving under the influence to the extent that he was a less safe driver ("DUI less safe)[1] and driving on the wrong side of the road.[2] Plemmons appeals the trial court's subsequent denial of his motion for new trial, (1) arguing that the trial court erred by admitting his refusal to submit to State-administered chemical testing, and (2) challenging the sufficiency of the evidence. We affirm for the reasons that follow.

---

[1] OCGA § 40-6-391 (a) (1).

[2] OCGA § 40-6-40 (a).

Construed in favor of the verdict,[3] the record shows that on the evening of November 24, 2009, Melissa Reed was standing outside when she observed Plemmons's truck traveling quickly down the middle of a residential street. As Plemmons traversed a curve in the road, he lost control of the vehicle, veered off the road, and struck a fire hydrant, ripping it out of the ground.[4] Although the engine was still running after the impact, Plemmons attempted to restart it.

Plemmons's next-door neighbor, Michael Lynn Francis, was in his car beside Reed, who was standing outside, when he heard the impact. Francis exited his vehicle and approached Plemmons to ascertain if he was hurt. Plemmons was hitting the accelerator because the truck was "hung" on the fire hydrant, and water from the hydrant was running down the street. Plemmons then exited his truck, and Francis jumped into it and placed it into park after noticing that the rear tires were still turning. Plemmons asked Francis

---

[3] See *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998).

[4] According to Reed, there were no vehicles in Plemmons's path prior to impact, and there were no vehicles traveling behind his truck.

several times if someone had called the police. According to Francis, Plemmons was bleeding from his lip, smelled like beer, had slurred speech, was "stumbling and awkward[]," and appeared to be "drunk."

Kay Rupp, who was in bed, heard the noise of the impact, which awoke her sleeping husband. Rupp went outside and saw that Plemmons's truck struck and shattered her cement mailbox before landing on the fire hydrant, which was spewing water. Plemmons had blood on his forehead, was "staggering," and had slurred speech, and Rupp "smelled a very strong, powerful smell of alcohol" emanating from him.

When Deputy Lawrence E. Tanner of the Forsyth County Sheriff's Department responded to the scene, he observed that Plemmons's nose was bleeding, he had a large gash from his nose to his mouth, his speech was slurred, his eyes were bloodshot and watery, he was unsteady on his feet, and he smelled of alcohol. Plemmons admitted that he had consumed "a few beers," but said that he had lost control of his vehicle when he swerved to avoid hitting another vehicle that swerved in front of him, and he had hit his face on the steering wheel. Although he believed Plemmons was intoxicated to the extent that he was a less safe driver based upon his manifestations, Deputy Tanner did not perform field sobriety tests upon him because

he believed Plemmons needed medical attention. Plemmons was transported to the emergency room via ambulance, and Deputy Tanner followed him in his patrol car. After speaking to the charge nurse, Deputy Tanner entered Plemmons's hospital room and wrote him citations for DUI less safe and failure to maintain lane[5]; the citations directed Plemmons to appear in court on February 2, 2010. The officer then advised Plemmons that he was "under custodial arrest," which Deputy Tanner later testified meant that Plemmons "was not processed, which means he was not arrested," explaining that "[t]hat's generally what we do when somebody's going to the hospital. You don't arrest them on the scene because the County doesn't want to pay for their bill. So they're not processed. If they're going to the hospital, . . . when he goes to court that's when he's processed on all his paperwork."[6] Deputy Tanner gave

[5] After realizing that the road Plemmons was driving on at the time of the incident did not contain a striped dividing line, the State filed an amended accusation charging Plemmons with driving on the wrong side of the road in violation of OCGA § 40-6-40 (a) instead of failure to maintain lane. See OCGA § 40-6-40 (a) ("Upon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway" except in certain circumstances not applicable in this case); OCGA § 40-6-48 (a) (1) ("Whenever any roadway has been divided into two or more clearly marked lanes for traffic, . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane. . . .").

[6] Deputy Christian Scott Goldsberry, the second officer on the scene that night, testified that he stayed behind with Plemmons' truck to wait for the wrecker while Plemmons was transported to the hospital. Goldsberry did not inventory or impound

Plemmons the citations and then read him the implied consent rights. Plemmons refused any testing, and the deputy left him at the hospital for treatment.

Following a jury trial, Plemmons was found guilty of DUI less safe and driving on the wrong side of the roadway. The trial court denied his subsequent motion for new trial, and this appeal followed.

1. Plemmons argues that the trial court erred by denying his motion in limine to exclude evidence that he refused state-administered chemical testing.[7] We find no basis for reversal.

Prior to trial, Plemmons filed a motion in limine to exclude his refusal to submit to chemical testing. The trial court denied the motion, specifically relying upon *Hough v. State*,[8] and concluding that because Plemmons had sustained serious

_____

the vehicle because Plemmons had not yet been arrested.

[7] See *State v. Collier*, 279 Ga. 316, 317 (612 SE2d 281) (2005) ("Under the implied consent law, the consequences of refusing the requested testing [include] the possibility of admission of such refusal at a criminal trial. . . .").

[8] 279 Ga. 711, 713 (1) (a) (620 SE2d 380) (2005) (Law enforcement may request a driver who has not been arrested to submit to chemical testing if the driver "has been involved in a traffic accident resulting in serious injuries or fatalities and the investigating law enforcement officer has probable cause to believe that the individual was driving under the influence of alcohol or other drugs.") (emphasis omitted).

injuries in the accident and Deputy Tanner had probable cause to believe that he had been driving under the influence, the officer was not required to arrest Plemmons prior to the reading of the implied consent. Following his conviction, Plemmons based his motion for new trial in part upon the trial court's denial of his motion in limine. A new judge presided over the motion for new trial, and it denied the motion, stating:

> [a]fter review of the record, the [c]ourt finds that [Plemmons's] refusal [to submit to testing] was properly admitted, not for the reason stated by the court that the defendant suffered a serious injury as defined by OCGA § 40-5-55, but because, under the totality of the circumstances, [Plemmons] was arrested prior to the request for a chemical test.

We agree.

> OCGA § 40-5-55 (a) provides, in relevant part:

> [A]ny person who operates a motor vehicle upon the highways or elsewhere throughout this state shall be deemed to have given consent, subject to Code Section 40-6-392, to a chemical test or tests of his or her blood, breath, urine, or other bodily substances for the purpose of determining the presence of alcohol or any other drug, *if arrested for any offense* arising out of acts alleged to have been committed in violation of Code Section 40-6-391.[9]

---

[9] (Emphasis supplied.)

"An arrest is accomplished whenever the liberty of another to come and go as he pleases is restrained, no matter how slight such restraint may be. The defendant may voluntarily submit to being considered under arrest without any actual touching or show of force."[10] The adequacy of implied consent notice depends upon

> whether the individual was formally arrested or restrained to a degree associated with a formal arrest, [and] not whether the police had probable cause to arrest. The test is whether a reasonable person in the suspect's position would have thought the detention would not be temporary. . . . *[I]t is the reasonable belief of an ordinary person under such circumstances, and not the subjective belief or intent of the officer, that determines whether an arrest has been effected.*[11]

Whether a suspect is under custodial arrest

> is a mixed question of law and fact. Therefore, to the extent that determination of the issue hinges on resolution of factual questions, an appellate court construes the evidence most favorably to uphold the trial court's findings and accept those findings unless they are clearly

---

[10] *Clements v. State*, 226 Ga. 66, 67 (2) (172 SE2d 600) (1970).

[11] (Punctuation omitted; emphasis supplied.) *Suluki v. State*, 302 Ga. App. 735, 738 (1) (691 SE2d 626) (2010), quoting *State v. Fisher*, 293 Ga. App. 228, 230 (666 SE2d 594) (2008).

erroneous; but the appellate court independently applies the legal principles to those facts.[12]

Here, Deputy Tanner testified that in Plemmons's room at the hospital, he "wrote a ticket DUI less safe. I read – I told [Plemmons] he was under custodial arrest, gave him the tickets[,] and then read him implied consent, and he refused." Given this evidence, particularly the officer's statement to Plemmons that he was "under custodial arrest," we find no error in the trial court's determination that a reasonable person in Plemmons's position would not think that he was free to leave at the time Deputy Tanner read the implied consent warnings, and therefore, "the reading of the notice was done at the 'time of the arrest' as required by OCGA §§ 40-5-55, 40-5-67.1 (a), and 40-6-392 (a) (4)."[13]

Plemmons's reliance upon *Handschuh v. State*[14] is misplaced. In *Handschuh*, we reversed the denial of the defendant's motion to suppress his refusal to submit to chemical testing of his bodily fluids because the officer read him the implied consent

---

[12] (Punctuation omitted.) *Buford v. State*, 312 Ga. App. 411, 413 (1) (718 SE2d 605) (2011), quoting *State v. Norris*, 281 Ga. App. 193, 196 (635 SE2d 810) (2006).

[13] *Crawford v. State*, 246 Ga. App. 344, 345 (1) (540 SE2d 300) (2000).

[14] 270 Ga. App. 676 (607 SE2d 899) (2004).

8

warning six days before his arrest.[15] In this case, in contrast, although Plemmons was not processed at the jail at the time, Deputy Tanner explicitly told Plemmons that he was under arrest. And Deputy Tanner's subsequent clarification at trial that he did not "process" Plemmons – meaning that Plemmons "was not arrested" because the officer did not want the county to be responsible for paying Plemmons's hospital bill – does not require reversal. There is no evidence that this explanation was communicated to Plemmons, who was awaiting treatment at the hospital for injuries sustained in a traffic accident and speaking to the officer who had followed the ambulance in his patrol car after Plemmons told him he had consumed alcohol. Accordingly, we find no error in the trial court's determination that "[u]nder the totality of the circumstances, . . . a reasonable person in [Plemmons's] position would believe that he was not free to leave."[16]

2. Plemmons also challenges the sufficiency of the evidence. When an appellate court reviews a challenge to the sufficiency of the evidence

---

[15] See id. at 678-679 (1).

[16] See *Evans v. State*, 274 Ga. App. 845, 846-847 (619 SE2d 341) (2005) (affirming admission of results of chemical testing administered at the hospital after officer advised driver of his implied consent rights before writing a uniform traffic citation for DUI).

the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.[17]

Here, Plemmons points out that the second officer on the scene did not smell alcohol on him. He also states in his appellate brief that "essentially the evidence in this case consisted of Deputy Tanner testifying of an odor of alcohol and that [Plemmons] told him that he had consumed some alcohol earlier that day and the actual car accident itself." While this evidence alone is sufficient to support Plemmons's convictions, this argument completely ignores the testimonies of Reed, Francis, and Rupp, including that Plemmons drove in the middle of the road, lost

---

[17] (Emphasis in original; citation omitted.) *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

control of his truck, and he smelled of alcohol, had slurred speech, and was stumbling. This evidence suffices to support Plemmons's convictions.[18]

*Judgment affirmed. McFadden and Boggs, JJ., concur.*

---

[18] See id.; *Coghlan v. State*, 319 Ga. App. 551, 553-554 (737 SE2d 332) (2013) (DUI less safe); *Dotson v. State*, 276 Ga. App. 418, 419-420 (1) (a) & (b) (623 SE2d 252) (2005) (DUI and driving on the wrong side of the road).